In re STE. JAN–MARIE, INC., Debtor.

Donna BUMGARDNER,
Trustee, Plaintiff,

v.

Ines ROSS, Defendant.

Bankruptcy No. 90–26328–BKC–AJC.
Adv. No. 91–0906–BKC–AJC–A.

United States Bankruptcy Court,
S.D. Florida.

Feb. 19, 1993.

Robert C. Meyer, Coral Gables, FL, for trustee, plaintiff.

Michael E. Greene, Coral Springs, FL, for defendant.

## MEMORANDUM OF OPINION AND ORDER [1]

RANDOLPH BAXTER, Bankruptcy Judge.

Defendant, Ines Ross (Ross), has petitioned the Court to amend the findings of facts, amend the judgment, or, alternatively, set aside the prior judgment and grant a new trial. Additionally, an imposition of sanctions against the Plaintiff, Donna Bumgartner (Trustee), is requested by Ross.

Following the conclusion of an adversary proceeding filed by the Trustee to avoid certain prepetition transfers pursuant to 11 U.S.C. 548, the Court rendered a bench ruling on April 24, 1992, finding that the subject transfers were avoidable. Thereupon, the Court directed the prevailing Plaintiff to prepare and submit an entry consistent with the Court's ruling in the matter. Once submitted and entered, Ross' present motion to amend findings, etc., was filed. Upon further consider-

ation, the Defendant's motion is hereby granted.

## I.

The Debtor, St. Jan–Marie, Inc., was the manufacturer of a line of swimwear. Its president and sole owner, Donald Ross, owned the company since 1982. The Defendant, Ines Ross, is Donald Ross' daughter-in-law and was employed by the Debtor since 1989 performing bookkeeping and other clerical-type duties for the Debtor. (Testimony, Defendant). She reported directly to Donald Ross and is an "insider" as that term is defined under § 101 of the Bankruptcy Code. Her testimony revealed that she was aware that the Debtor was in financial trouble one month prior to its Chapter 7 petition being filed. Her testimony was forthright and was very credible. The core of her testimony addressed a series of check cashing activities which occurred on the eve of the Debtor filing Chapter 7. In this regard, she possessed authority to cash checks on behalf of the Debtor corporation, notwithstanding that the Debtor's president, Donald Ross, was equivocal regarding her authority to do so. Ultimately, he testified that she was given such authority in March of 1990 (D. Ross, Direct). Within a one-year period prior to the Debtor's bankruptcy filing, she cashed several checks, at Donald Ross' direction. In doing so, she endorsed the checks, received the cash and made full remittances of the proceeds to Donald Ross. (Defendant, Cross–Exam.). During the course of the check cashing activity, she was unaware at the time of check cashing as to the purpose for the several checks that were cashed but later learned such was for salary and other matters. (*Id.*). (See, also, Exhibits 4, 5, and 12). For each corporate check she cashed, she did so dutifully at Donald Ross' direction, with no explanation from Donald Ross regarding the purpose of the check being cashed. (*Id.*). Other than the checks exhibited by the Trustee, she testified that she had cashed other checks at Donald Ross' instructions.

1. Judge Randolph Baxter, U.S. Bankruptcy Judge, N.D. Ohio, sitting by designation.

Quite significantly, the Defendant, Ines Ross, testified that the Debtor's payroll was not ordinarily paid in cash, as it purportedly was done on the eve of bankruptcy filing. Prior to this apparent last minute flurry of check cashing activity, Ines Ross had not been directed by Donald Ross or anyone to cash corporate checks for making payroll payments in cash. As of August 24, 1990, she was under the belief that the Debtor was current with its payroll obligations. Two checks (Exhibits 4 and 5) were cashed by Ines on the same date and were in the amounts of $2,500.00 and $7,500.00, respectively. Prior to that time period, she had never taken such large checks of the Debtor to the bank for cashing. (*Id.*). Once cashed, she gave all of the check proceeds to Donald Ross, the Debtor's owner.

The Defendant was thoroughly familiar with the checks she was directed to draft and cash. From the checks exhibited to her at trial, she was familiar with each one drafted by her and testified that her entries made on the checks when drafting same were made in blue ink, as opposed to the other entries made thereon by other parties which were made in black ink. As she was unaware of the purpose of each check drafted by her, she left the "memo" line blank on each check when drafted, yet entries were made in black ink on such lines by someone other than the Defendant, according to her testimony which the Court finds to be credible. This finding further evinces that the purpose of the check was inserted thereon not only by a different drafter but also was entered at a point in time other than when the Defendant drafted the checks. The black ink entries on the $2,500.00 and $7,500.00 checks were made by Todd Snyder, another employee.

During this same time period, she received a paycheck in an amount of $1,800.00 as salary for the week of August 28, 1990, although that amount was not typical of her average weekly salary. Although she worked much overtime during that week, she testified that she did not earn $1,800.00 for that week and further stated that part of it represented an advance payment of salary. (*Id.*). Her average weekly salary ranged between $350.00 to $400.00 (J. Goldstein, Direct).

Ines Ross, upon inquiry, could not offer an explanation as to why Donald Ross chose to pay salaries in cash as opposed to checks during this period of time. Previously, the Debtor's employees were paid by corporate checks. After she cashed a corporate check for $7,500.00, at Donald Ross' instructions, there remained a balance of $527.82 in the corporate checking account. Not only was Donald Ross using Ines Ross as a conduit to cash corporate checks to receive and place the proceeds beyond the reach of creditors, he did so at a time when all of the Debtor's accounts receivable were liened in favor of a third party (i.e., Rosenthal and Rosenthal). Unequivocally, she testified that Donald Ross, the owner, received the proceeds of the check cashing activity, and he decided who and what would be paid. Not only was Ines Ross' testimony credible, it was uncontested, generally.

In August of 1990, during the check cashing spree, Donald Ross, as owner, knew that the Debtor corporation would be unable to produce a 1991 line of swimwear. (D. Ross, Cross–Exam.). He also knew that the Debtor corporation was insolvent. The Debtor's petition schedules reflect total liabilities of $2.6 Million against assets of $262 Thousand. His testimony was clear to state that the petition schedules were true and correct to his knowledge. Furthermore, Donald Ross, while knowledgeable of the Debtor's insolvent state, did not know how much money would be required to return the Debtor to solvency. He did know, however, that Rosenthal and Rosenthal, in addition to First Union, had liens on all of the Debtor's assets. (*Id.*). Incredibly, he testified that he did not necessarily know that all of the Debtor's accounts receivable were liened. As president and sole shareholder of the Debtor corporation, that testimony was simply incredible.

Quite interestingly, Donald Ross admitted that, prior to August of 1990, he had not paid his employees by cash payments, yet he did so during August, 1990 on the

eve of the Debtor's bankruptcy filing when the Debtor was insolvent. (*Id.*). He was unable to provide a particular reason for having done so during that time period. Initially, he testified that he had not given Defendant Ines Ross authority to cash a corporate check in the amount of $2,500.00 (Exhibit 4). That testimony was impeached (*Id.*). He further admitted that he could have paid each employee by separate check, as was customarily done, but apparently elected not to do so. Further, he admitted that prior to the issuance of certain checks (Exhibits 4 and 5) he had never paid a payroll in advance of it being earned. Although he authorized the advanced salaries while the Debtor was en route to bankruptcy filing, he testified that it was not the Debtor's policy to pay advance salaries. (*Id.*). Moreover, he authorized payments to be made between September 11 and 20, 1990, while the Debtor was in bankruptcy. Of equal significance, while the Debtor produced no swimwear in August of 1990, he was aware that he owed his unsecured creditors at the time he paid advanced salaries to employees for their loyalty. (*Id.*).

Even after the Debtor corporation filed Chapter 7, without court authorization, the Debtor continued to operate its business. Contrary to the Debtor's record and Ines Ross' own testimony, he testified that the $1,800.00 he paid to Ines Ross during the eve of bankruptcy was for one week's salary. He admitted he received the proceeds of the $2,500.00 and $7,500.00 checks cashed by Ines Ross, and further testified that he distributed the cash proceeds from both checks. Following the close of the Defendant's case-in-chief, the Defendant rested and petitioned the Court for dismissal of the Trustee's action.

## II.

Section 548 of the Bankruptcy Code [11 U.S.C. 548] addresses fraudulent transfers and obligations. Thereunder, a trustee is authorized to avoid a transfer of an interest of the debtor in property that was made within one year of the bankruptcy petition filing date where the debtor made the transfer with an actual intent to hinder, delay or defraud a creditor or received less than a reasonably equivalent value in exchange for the transfer while insolvent or became insolvent by reason of the transfer. 11 U.S.C. 548(a)(1) and (2). The term "transfer" is defined in § 101(54) of the Code to include "every made, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in the property...." 11 U.S.C. 101(54). *See, U.S. v. Goodstein*, 883 F.2d 1362, 1366–67 (11th Cir.1989), *cert. denied*, 494 U.S. 1007, 110 S.Ct. 1305, 108 L.Ed.2d 481 (1990).

In order to avoid a transfer under § 548(a)(1), actual fraudulent intent must be established by the trustee and must be proved by clear and convincing evidence. *U.S. v. Gleneagles Inv. Co., Inc.*, 565 F.Supp. 556 at 580 (D.C.Pa.1983), *aff'd. sub nom.; U.S. v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir.1986), *cert. denied*, 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987). Further, evidence established must present a clear pattern of purposeful conduct. *In re Checkmate Stereo & Elects., Ltd.*, 9 B.R. 585, 612–13 (Bankr. E.D.N.Y.1981), *aff'd.*, 21 B.R. 402 (E.D.N.Y.1982). *See also, In re Baugh*, 60 B.R. 102, 105 (Bankr.E.D.Ark.1986) ("Circumstances must be so strong and well connected as to clearly show fraud.") Mere suspicion of fraud does not suffice. *In re S. & W. Exporters, Inc.*, 16 B.R. 941, 947 (Bankr.S.D.N.Y.1982).

The requisite elements to be proved in order to find a transfer voidable under § 548(a) are to be read disjunctively. "Fraudulent Transfers", M. Cook, *et al.* (May, 1992) Bankruptcy Litigation Institute, Prentice Hall. Thusly, actual intent to defraud will be found to exist even where the debtor's purpose is not ultimately to deprive creditors of payment, but merely to hinder or delay creditors. *Id.; In re Bigelow Design Grp.*, 956 F.2d 479, 484 (4th Cir.1992).

## III.

In the present action, there has been adduced no purposeful pattern of conduct on the part of the Defendant to hin-

der, delay or defraud a creditor of the Debtor's estate. She merely performed her assigned duties, at the direction of the Debtor's principal. To the extent that a fraudulent transfer may have occurred, Ines Ross is not the proper defendant, as the trustee has not sufficiently presented a case that she actually intended to commit any of the elements under § 548(a)(1). Additionally, the Trustee has failed to prove a case under § 548(a)(2).

■ Simply stated, there are limits on the types of transfers which are avoidable under § 548. The factual particulars of this action gives rise to one of those limitations. Neither the letter nor spirit of § 548(a) countenances a recovery under § 550 from a conduit or agent who acted in good faith. The present Defendant acted in good faith. As earlier enunciated in this Circuit, "[It] is not fair to allow a trustee to recover from certain parties". *In re Chase & Sanborn Corp.*, 848 F.2d 1196, 1201 (11th Cir.1988). The present action typifies one of those instances. A mere conduit of funds is not an "initial transferee" under § 550 of the Code. *In re Harbour*, 845 F.2d 1254 (4th Cir.1988), *citing, In re Block & Geddes, Inc.*, 59 B.R. 873 (Bankr. S.D.N.Y.1986); *See also, Chase & Sanborn, supra; In re Fabric Buys of Jericho, Inc.*, 33 B.R. 334 (Bankr.S.D.N.Y.1983) ("In some circumstances, a literal application of section 550(a) would permit the Trustee to recover from a party who is innocent of wrong doing and deserves protection."), *quoting, 4 Collier on Bankruptcy*, ¶ 550.02, at 550–8 (15th Ed.1983).

Upon reconsideration of this adversary in view of the instant motion, the Court's Order and Judgment issued on October 5, 1992 is hereby vacated. As shown by the amended findings herein, the Defendant, Ines Ross, was merely a conduit utilized by her employer, Donald Ross, who placed assets of the Debtor's estate beyond the reach of estate creditors. As the complaint prosecuted was premised on § 548 of the Code, the requisite elements thereunder have not been proved by the requisite standard of evidence as may pertain to Ines Ross. As Ines Ross is the only party defendant to this action, the prior judgment is hereby vacated, and the Trustee's Complaint against Ines Ross is hereby dismissed.

Accordingly, in view of the amended findings herein, judgment is hereby rendered in favor of the Defendant, Ines Ross. The Complaint is dismissed. Costs are awarded to the Defendant.

IT IS SO ORDERED.

## JUDGMENT

A Memorandum Of Opinion And Order having been rendered by the Court in these proceedings,

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the Order and Judgment issued on October 5, 1992 is vacated, and judgment is rendered in favor of the Defendant, Ines Ross. The Trustee's Complaint against the Defendant is dismissed. Costs are awarded to the Defendant.