**In re Marlin E. REEVES, Debtor.**

**James C. LUKER, Trustee, Plaintiff–Appellee/Cross–Appellant,**

v.

**Billie Fern REEVES; Reeves Trucking, Inc.; Reeves Farms, Inc.; Ella Reeves, Individually and as Executrix of the Estate of Elmer Reeves; Sherry Smith, Defendants–Appellants/Cross–Appellees,**

**Marlin E. Reeves (Debtor); Marlin Lynn Reeves; Bank of Brinkley; United States Commodity Credit Corporation, Defendants.**

Nos. 94–2956, 94–3259, 94–3261, 94–3263 and 94–3343.

United States Court of Appeals, Eighth Circuit.

Submitted April 12, 1995.

Decided Aug. 28, 1995.

Fletcher Long, Jr., Forrest City, AR, argued, for appellants.

Daniel K. Schieffler, West Helena, AR, argued, for appellee.

Before LOKEN, Circuit Judge, and HENLEY and FRIEDMAN,* Senior Circuit Judges.

LOKEN, Circuit Judge.

These consolidated appeals arise out of the bankruptcy of Marlin Reeves, an Arkansas businessman whose farming operations and real estate investments soured in the late 1980s. Marlin[1] was denied a bankruptcy discharge because of his efforts to conceal assets from his creditors. In these adversary proceedings, the trustee has avoided various fraudulent and preferential asset transfers to Marlin's relatives and to entities controlled by the Reeves family. The transferees appeal the relief afforded the trustee, and the trustee cross-appeals the district court's decision that it lacks jurisdiction to dissolve a close corporation in which the bankruptcy estate is a shareholder. We reverse the district court's jurisdictional decision and its order that a family corporation must turn over money it never actually received. In all other respects, we affirm.

## I. Transfers to Reeves Trucking, Inc.

In the first action, the trustee seeks to seize all assets of Reeves Trucking, Inc. ("RTI"), for the bankruptcy estate. Marlin's wife formed RTI in September 1986, receiving all its issued shares. Marlin then transferred substantial assets to RTI, including farm equipment and the assets of a former sole proprietorship, Reeves Trucking. After this change in ownership, Marlin operated his businesses through RTI, and the Reeves-es paid a substantial portion of their living and other personal expenses from RTI funds. Marlin filed his Chapter 7 petition in December 1987.

The bankruptcy court found that Marlin fraudulently transferred business assets to RTI to shield those assets from his creditors. The court concluded that RTI is a "sham," imposed a constructive trust on all its assets in favor of the bankruptcy estate, and decreed that "everything of value in the corporation, including post-petition profits, constitutes property of the estate."

The district court agreed that RTI is a sham, that Marlin fraudulently conveyed assets to RTI prior to filing for bankruptcy, and that those assets are part of the bankruptcy estate. However, with respect to RTI's post-petition activities, the court concluded that § 541(a)(6) of the Bankruptcy Code limits the trustee's recovery to the "rents, profits, or proceeds" of the original estate. Therefore, the court modified the bankruptcy court's order to provide that RTI may retain any assets it proves are the product of Marlin's post-petition labors or other infusions of new value.

On appeal, RTI argues that the bankruptcy court and the district court erred in disregarding RTI's corporate existence and in imposing a constructive trust on its assets. We conclude this is an appropriate case to employ the constructive trust remedy. There is ample evidence supporting the fraudulent conveyance finding, as RTI virtually concedes. The issue then becomes one of remedy. Under Arkansas law, a constructive trust is a broad equitable remedy used when the legal title to property has been obtained through fraud, misrepresentation, concealment, or any other circumstance making it unjust for the holder to retain the property. *Bragg v. Hartney,* 92 Ark. 55, 121 S.W. 1059, 1060 (1909); *see also N.S. Garrott & Sons v. Union Planters Nat'l Bank of Memphis (In re N.S. Garrott & Sons),* 772 F.2d 462 (8th Cir.1985). Marlin placed his business assets beyond the reach of his credi-

---

* The HONORABLE DANIEL M. FRIEDMAN, Senior United States Circuit Judge for the Federal Circuit, sitting by designation.

1. To avoid confusion, we will refer to members of the Reeves family by their first names.

tors and then commingled those assets with other assets through numerous pre-petition and post-petition transactions. A constructive trust may be used to make the estate whole.

■ Alternatively, RTI argues that the trustee may recover only assets Marlin conveyed to RTI prior to filing for bankruptcy, plus any assets purchased with funds obtained from the sale of those original assets. In addition, RTI contends that the district court erred in making RTI prove which of its present assets may not be subject to a constructive trust. In other words, RTI would place the burden on the trustee to prove that a particular RTI asset is directly traceable to a pre-petition fraudulent conveyance.

In our view, this part of the remedy question is unnecessarily muddled by the trustee's attempt to disregard RTI's corporate existence. RTI was formed over one year before Marlin filed for bankruptcy. Had Marlin simply incorporated Reeves Trucking in September 1986—for example, to gain the benefits of limited liability—his creditors likely could not have complained. Thus, incorporation did not defraud creditors; it was placing ownership of the resulting corporation in Marlin's wife that was the fraudulent conveyance. Therefore, it is not the corporate assets which should be placed in the bankruptcy estate, it is RTI's stock.

Clarifying that it is RTI stock to which the bankruptcy estate is entitled greatly reduces the impact of § 541(a)(6) on the remedy analysis. If the fraudulent conveyance was the transfer of Reeves Trucking assets to RTI, then avoiding that transfer results in the assumption that Marlin went into bankruptcy operating Reeves Trucking as a sole proprietorship. In that event, his bankruptcy estate would include the business and its assets at the time of filing, plus the "proceeds, product, offspring, rents, or profits of or from" those assets. § 541(a)(6). But in determining post-petition rents and profits, the statute excludes "services performed by an individual debtor after the commencement of the case." The manner in which to divide post-petition earnings of a proprietorship between the trustee and the individual debtor under § 546(a)(6) has badly divided other

courts. *Compare FitzSimmons v. Walsh (In re Fitzsimmons)*, 725 F.2d 1208 (9th Cir. 1984), *with In re Cooley*, 87 B.R. 432 (Bankr. S.D.Tex.1988), *with In re Herberman*, 122 B.R. 273 (Bankr.W.D.Tex.1990). But here Marlin chose the corporate form of doing business well before filing, and the fraudulent conveyance was his indirect transfer of the corporation's ownership to his wife. Therefore, the corporate stock becomes an asset of the estate, and the § 541(a)(6) exclusion is an issue only to the extent RTI's earnings are attributable to Marlin's uncompensated services.

Viewing the situation in this light also puts to rest RTI's other contentions. First, under this approach, the corporate entity is not ignored. Rather, a constructive trust is imposed on RTI stock in the hands of Marlin's wife, who received that stock for no value with the intent to defraud Marlin's creditors. Second, focusing on RTI's stock makes it apparent that the trustee's remedy is not limited, as RTI argues, to the specific assets initially transferred to the corporation and any proceeds traceable to those assets. Because the estate owns RTI stock, the question is whether to exercise the bankruptcy court's remedial discretion to segregate and exclude from the bankruptcy estate any post-petition additions to the RTI enterprise.

■ Turning to that question, if RTI's assets now include the fruits of post-petition infusions of capital, made by or on behalf of RTI's owners on the assumption that RTI was not part of Marlin's Chapter 7 estate, then it would violate the "fresh start" principle of bankruptcy to pull those assets into the estate simply because many years passed while determining that RTI's stock was in fact part of the estate. *Cf. In re Lotta Water Land Co.*, 25 B.R. 32, 36 (Bankr.N.D.Tex. 1982). Therefore, to the extent that RTI can establish that it has acquired post-petition assets through transfers to RTI or uncompensated services by Marlin that would not have occurred had the estate owned its stock, then those assets should be segregated and returned to the corporation's prior owners. Though it reached this result by a somewhat different analysis, that is precisely what the district court ordered the bankruptcy court

to determine on remand. That order was well within the court's considerable equitable discretion in fashioning an appropriate bankruptcy remedy. *See* 11 U.S.C. § 105(a). Therefore, the district court's Order dated August 1, 1994, in bankruptcy case No. A.P. 89–2018 is affirmed.

## II. The Transfer to Elmer and Ella Reeves.

■ In the second action, the trustee seeks to compel Marlin's parents, Elmer and Ella Reeves, to turn over a $200,000 payment as a voidable preference under § 547 of the Bankruptcy Code. The issue is whether the transaction was a preferential repayment of Marlin's antecedent debt to his parents.

In March 1982, Marlin acquired an interest in a $426,000 promissory note, referred to in this litigation as the "Fuchs Note." Later in 1982, Elmer and Ella lent Marlin $260,000 to finance unrelated transactions. After the Fuchs Note went into default, Marlin executed an "Assignment" purporting to convey "all of his right, title, and interest" in the Fuchs Note to his parents. The Assignment was backdated April 3, 1982. Despite the Assignment, Marlin personally pursued litigation to collect the Fuchs Note and ultimately received $325,976 in a complex settlement. In January 1987, Marlin transferred $200,000 of the settlement proceeds to his parents, within one year of his bankruptcy. *See* § 547(b)(4)(B). Elmer's books reflected this as a partial payment of Marlin's $260,000 debt. Nevertheless, Elmer and Ella argue that the Assignment transferred ownership of the Fuchs Note to them, so that their interest in the $200,000 proceeds is superior to that of Marlin's creditors under Ark.Code Ann. §§ 4–58–102, –105. We disagree.

■ 1. The parties' intent determines whether a document purporting to effect an absolute assignment of a note will be treated instead as creating a security interest in that note. *See, e.g., Major's Furn. Mart, Inc. v. Castle Credit Corp.,* 602 F.2d 538 (3d Cir. 1979); *Wambach v. Randall,* 484 F.2d 572 (7th Cir.1973). The bankruptcy court and the district court found that the parties to the Assignment did not intend an absolute transfer of the Fuchs Note, but merely the creation of a security interest. In other words, Marlin's interest in the Fuchs Note became collateral securing the antecedent debt to his parents. Ample evidence supports this finding.[2] Elmer and Marlin both repeatedly referred to the Assignment as "collateral" or "security" for the $260,000 loan to Marlin. The parents conceded in the district court that the Assignment gave them a right to recover only the unpaid balance of their loan to Marlin, not Marlin's entire interest in the Fuchs Note. Marlin collected on the note by settling litigation brought in his own name. Marlin alone directed disbursement of the settlement proceeds. Thus, the Assignment of the Fuchs Note merely created a security interest.

■ 2. Because Elmer and Ella had only an unperfected security interest in the Fuchs Note, Marlin's $200,000 payment to them was a preference. Article 9 of the Arkansas UCC applies to "any transaction (regardless of its form) which is intended to create a security interest" and includes "security interests created ... by assignment." Ark. Code Ann. §§ 4–9–102(1)(a), 4–9–102(2). A security interest in a promissory note may only be perfected by possession, and remains perfected only so long as possession is retained. *See* Ark.Code Ann. §§ 4–9–105(1)(i), –304, –305; *McIlroy Bank v. First Nat'l Bank of Fayetteville,* 252 Ark. 558, 480 S.W.2d 127 (1972). The bankruptcy court found that Elmer and Ella did not possess the Fuchs Note when Marlin filed suit to collect the note, or when he transferred the $200,000 to his parents. Thus, they did not have a perfected security interest in the note or its proceeds, and the trustee was entitled to avoid the preferential transfer of $200,000 under § 547 of the Code.

## III. Issues Relating to Reeves Farms, Inc.

Reeves Farms, Inc. ("RFI"), is a family corporation formed by Elmer Reeves in 1970,

---

**2.** Under the "two court" rule, we will not overturn consistent findings of the bankruptcy and district courts absent a "very obvious and exceptional showing of error." *In re Gerrald,* 57 F.3d 652, 654 (8th Cir.1995).

principally for estate planning purposes. At the time in question, Marlin was RFI's president. Its shares are equally owned by Marlin, his mother Ella, and his two sisters. Marlin's twenty-five percent interest is an asset of his bankruptcy estate. In the third action, the trustee seeks to compel the liquidation of RFI in order to realize the estate's twenty-five percent interest, and also seeks to recover $65,000 of the Fuchs Note proceeds that Marlin passed through an RFI bank account on its way to other transferees. The district court concluded that the bankruptcy court lacked jurisdiction to compel RFI's liquidation but that RFI must turn over the $65,000. We disagree with both decisions.

**A. Involuntary Liquidation.** Under Arkansas law, a shareholder may sue to liquidate the assets of a corporation on the ground that "the acts of the directors or those in control of the corporation are illegal, oppressive, or fraudulent." Ark.Stat.Ann. § 4–26–1108(a)(1)(B). The trustee, for the estate as shareholder, sues to liquidate RFI because (i) it was a party to various fraudulent conveyances on behalf of Marlin, a controlling director; (ii) management and other shareholders of RFI have discriminated against the estate as a minority shareholder, for example, by failing to notify the trustee of corporate meetings; and (iii) "Reeves Farms, Inc. has failed to pay the Trustee any money [but] has retained earnings of $91,-978.96 and total equity in the amount of $111,534.70."

■■■ The bankruptcy court and the district court have jurisdiction over any action that is "related to" Marlin's Chapter 7 proceeding. See 28 U.S.C. §§ 157(c)(1), 334(b). An action is related to the bankruptcy case if "it affects the amount of property available for distribution or the allocation of property among creditors." Matter of Xonics, Inc., 813 F.2d 127, 131 (7th Cir.1987). See also Celotex, Corp. v. Edwards, — U.S. —, ——–——, 115 S.Ct. 1493, 1498–1500, 131 L.Ed.2d 403 (1995); Specialty Mills, Inc. v. Citizens State Bank, 51 F.3d 770, 774 (8th Cir.1995) ("An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action [and] in any way impacts upon the handling and administration of the bankrupt estate"); Abramowitz v. Palmer, 999 F.2d 1274, 1277–78 (8th Cir.1993). We conclude that the trustee's action to liquidate a close corporation in order to realize the value of the estate's shares is "related to" the underlying bankruptcy. The bankruptcy court has jurisdiction over this claim.

■■ Though it has jurisdiction over this noncore proceeding, the district court may abstain "in the interest of comity with State courts or respect for State law." 28 U.S.C. § 1334(c)(1). In enacting this specific abstention provision, "Congress wisely chose a broad jurisdictional grant and a broad abstention doctrine over a narrower jurisdictional grant so that the district court could determine in each individual case whether hearing it would promote or impair efficient and fair adjudication of bankruptcy cases." In re Salem Mtg. Co., 783 F.2d 626, 635 (6th Cir.1986).

Here, the possibility of realizing the estate's twenty-five percent interest in RFI through liquidation supports federal jurisdiction. It does not, however, entitle the trustee to liquidation as a matter of federal law. The trustee's right to involuntary liquidation is a matter of state law, and he stands in the shoes of an ordinary shareholder. An Arkansas court may well be the best forum to determine whether the corporation has been mismanaged or minority shareholders abused and, if so, whether the extraordinary remedy of involuntary liquidation is appropriate. This is an issue committed to the discretion of the district court. It necessitates a remand.

■■ **B. The Fuchs Note Proceeds.** Marlin's attorney initially received Marlin's share of the Fuchs Note settlement. Marlin instructed the attorney to deliver to Marlin a check for $65,000 payable to Reeves Farms, Inc. Apparently without the knowledge or approval of any other director, shareholder, or officer of RFI, Marlin opened a bank account in RFI's name at a remote bank, forging the necessary corporate approvals. He then deposited the $65,000 check in that account and later disbursed these funds to other entities he controlled (primarily RTI).

The trustee seeks to recover that $65,000 from RFI.

Section 550(a)(2) of the Code provides that the estate may recover property transferred in an avoided transfer from "the initial transferee of such transfer or the entity for whose benefit such transfer was made." Because Marlin's transfer of the $65,000 was avoidable, the bankruptcy court held RFI liable to turn over these funds as the initial transferee. The district court affirmed, noting that Marlin's attorney also represented Elmer and Ella in settling the Fuchs Note litigation and therefore they had constructive knowledge of this transfer. On appeal, RFI argues that it is not liable as a transferee under § 550(a)(2). We agree.

■ There is no finding that RFI received any benefit from the $65,000, so the question is whether RFI is an "initial transferee" for purposes of § 550(a)(2). At least seven other circuits have held that, to be an initial transferee, a party must have dominion and control over the transferred funds. *See In re First Sec. Mtg. Co.*, 33 F.3d 42 (10th Cir.1994); *In re Coutee*, 984 F.2d 138, 140–41 (5th Cir.1993), and cases cited. We approve of this standard, which neither the bankruptcy court nor the district court applied.

■ Marlin deposited the $65,000 into a new RFI bank account that he concealed well into his bankruptcy.[3] The trustee argues that Marlin had "real and apparent authority to act on behalf of" RFI and used the corporation as "a willing straw man" to conceal property from his creditors. However, the trustee cites no authority for the proposition that Marlin's fraudulent misuse of a corporate account for his own benefit makes RFI an "initial transferee" of the $65,000. While the doctrine of apparent authority would protect a third party that relied on Marlin's apparent power to act for the corporation, it does not convert every unauthorized act by a corporate officer into an act of the corporation. The trustee has ignored the governing "dominion and control" standard, and we cannot discern from his rather unintelligible recitation of the facts surrounding RFI any basis for concluding that RFI, as opposed to Marlin, ever had dominion and control over the $65,000. And the fact that Marlin's attorney also obtained a power of attorney from Elmer and Ella to settle the Fuchs Note litigation is irrelevant to this issue, since there is no evidence that Marlin's parents controlled RFI or that the attorney dealt with RFI on their behalf.

The bankruptcy court and the district court failed to apply the proper dominion or control standard. On this record, we cannot conclude as a matter of law that Marlin's fraudulent use of RFI as a conduit for this portion of the settlement proceeds made the corporation the initial transferee of the $65,000. Of course, to the extent that RFI was a mere conduit for an avoidable transfer of the settlement proceeds to RTI, that corporation becomes the initial transferee for purposes of § 550(a)(2), an issue the bankruptcy court may take up on remand.

## IV.

The district court issued three final orders that are the subject of this appeal. Its order remanding No. 89–2018M to the bankruptcy court and its order affirming the judgment in No. 89–2019M are affirmed. Its order affirming the judgment in No. 89–2020M is reversed in part, and that case is remanded for further proceedings consistent with this opinion.

---

3. Indeed, Marlin was eventually convicted of perjury for failing to disclose its existence.