FIRST NATIONAL BANK OF MISHAWAKA *v.* ASSOCIATES
INVESTMENT COMPANY ET AL.

[No. 20,511. Filed December 12, 1966. Rehearing denied February 24,
1967. Transfer denied January 25, 1968.]

*Thomas P. Laughlin, William T. Means, Donald R. Myers, Richard Bodine* and *Bingham, Loughlin, Means & Bodine,* of Mishawaka, all for appellant.

*George E. Herendeen,* of South Bend, for appellee.

CARSON, J.—In this appeal, we are called upon to determine the liability, if any, of a bank when it stops payment on a cashier's check, drawn on itself, at the request of the purchaser of the check.

The facts in this case may be summarized as follows:

Gordon Sheline was the President of Sheline Auto Sales, Inc. On February 21, 1961, Mr. Sheline went to the Arena Auto Auction in Chicago, Illinois, to purchase several automobiles, one of which was a 1961 Pontiac Bonneville. Because of previous difficulties in dealing with Sheline, the Arena Auction, a partnership of James Franks and Walter Cotton, would not accept Sheline's check for the cars. Sheline informed the partners that appellee, Associates, would floor plan the cars he wished to purchase. The partners confirmed this fact with a Mr. Smith who was the new business agent of Associates' Elkhart Branch, or with Mr. Scheibley, who was the manager of the Elkhart Branch. The testimony is conflicting as to which of these two gentlemen from Associates confirmed the fact that Sheline had a line of credit, through a floor plan arrangement, to cover the purchase price of the three cars Sheline wished to purchase. The person from Associates told Arena to give Sheline the certificates of title and possession of the cars since the floor plan would provide a sufficient amount to cover the check. The partners, in their deposition, testified that they would not have sold the cars to Sheline unless Associates had assured them of Sheline's financial backing.

After he had given a check to Arena, Sheline returned to Elkhart, Indiana. On February 22, 1961, Sheline executed a trust receipt to Associates for the three cars. There is a conflict in the evidence whether the money which Associates loaned Sheline for the floor planning was used for that purpose by Sheline or whether the check was endorsed by Sheline and immediately returned to Associates in payment of prior debts.

Prior to February 28, 1961, Kenneth Paddock became interested in purchasing the 1961 Pontiac from Sheline.

The price was $3,150.00. Paddock gave Sheline $150 as a down payment and went to appellant, First National Bank of Mishawaka, to get a loan on the balance. Paddock received a loan of $3,750.00 from the appellant, the additional amount to be used to pay off an existing loan on Paddock's 1961 Valiant. Paddock gave the bank a note, payable in ninety (90) days, for $3,750.00, plus a chattel mortgage on the 1961 Pontiac and the title to the 1961 Valiant. The chattel mortgage was filed in Elkhart County. Appellant, in order to protect all parties, issued a cashier's check for $3,000.00, payable to Paddock, Sheline, and Associates, which Paddock knew was floor planning the cars. Paddock endorsed the check and gave it to Associates. Paddock was given possession of the car but did not receive a title to the car since the Illinois title was being processed through the Indiana State Bureau of Motor Vehicles.

With the plot having thus developed, the Arena Auction again enters the picture. The check which Sheline had given to Arena was returned to Arena because of insufficient funds in Sheline's account. Immediately upon dishonor of the check, the partners from Arena went to Elkhart to get the cars back from Sheline. When they demanded that Sheline make the check good, he told them he couldn't. Arena took the other cars involved from Sheline. Sheline or his salesman told Arena that Paddock had purchased the Pontiac. Paddock then began receiving telephone calls about the Pontiac and noticed that his house was being kept under surveillance. Paddock hid the car. After enduring such harassment for several days, he told Franks where he had hidden the car. On March 4, 1961, Paddock and Franks went to First National and talked to Mr. Hesch in the Consumer Finance Department. Frank's partner in Arena insisted the car was his and suggested that a stop payment order be put on the cashier's check. Franks refunded $150 to Paddock and the bank put a stop payment order on the check. The check was presented to First National through regular banking channels and payment was refused.

Associates (appellee) filed a complaint, later amended, against The First National Bank of Mishawaka (appellant) demanding payment of the cashier's check. Appellant made a motion, which was granted, to include as parties defendant, Sheline and Paddock. Appellant answered in admission and denial and alleged further the affirmative defense of failure

of consideration in the transaction between Sheline and Paddock. Plaintiff-appellee replied in admission and denial. After trial to the court, judgment was for plaintiff. Appellant made a motion for new trial alleging that (1) the decision is not sustained by sufficient evidence and (2) the decision is contrary to law.

In the case *Dresher* v. *Roy Wilmeth Co.* (1948), 118 Ind. App. 542, 82 N. E. 2d 260, this court enunciated the basic rules concerning transactions involving vendor, vendee and a third party *bona fide* purchaser from the vendee.

"It is well settled that, where a person by his own acts makes it possible for a vendee of personal property to sell the property to a *bona fide* purchaser for value without notice, the original owner and seller may not recover the property from such *bona fide* purchaser. *Nichols* v. *Bogda Motors, Inc.* (1948), *ante,* p. 156, 77 N. E. 2d 905; *Rocco* v. *Server* (1929), 89 Ind. App. 457, 165 N. E. 335; *Hoham* v. *Aukerman-Tuesburg Motors* (1922), 77 Ind. App. 316, 133 N. E. 507."

\* \* \*

"Appellant assigned and transferred to the purchaser the title to the Cadillac automobile and stated therein under oath that no liens existed upon said car. Appellant could have protected himself by reserving a lien for the purchase price in the assignment of the title or by retaining possession of the certificate of title until the check received in payment had cleared the bank upon which it was drawn. He did neither but, on the contrary, gave the purchaser a lien-free, clear title and possession of the automobile so that such purchaser was enabled to sell, assign, and transfer a lien-free, clear title and possession of said automobile to appellee for value and without notice or knowledge of any liens or defects in the title. Under such circumstances, appellant was not entitled to recover possession of the automobile from appellee. *Hoham* v. *Aukerman-Tuesburg Motors, supra; Nichols* v. *Bogda Motors, supra; Patterson* v. *Indiana Investment and Securities Co.* (1921), 75 Ind. App. 489, 131 N. E. 19; Williston, *Sales, supra.*" See also Uniform Sales Act § 24, Acts 1929, ch. 192, § 24, p. 628.

In the case at bar, reasoning from the above cited authorities, Paddock's title to the Pontiac was good against the world

since Arena had not avoided Sheline's title prior to the time he sold the automobile to Paddock.

Under the Uniform Sales Act which was, at the time of this transaction, in effect, there are certain implied warranties in the sale of goods. One of these implied warranties is that "the buyer shall have and enjoy quiet possession of the goods as against any lawful claims existing at the time of the sale." Uniform Sales Act § 13 (2), Acts 1929, ch. 192, § 13 (2), p. 628. Where there is a breach of this warranty, the buyer may . . . "if the goods have already been received, return them or offer to return them to the seller and recover the price or any part thereof which has been paid." Uniform Sales Act § 69 (1) (d), Acts 1929, ch. 192, § 69 (1) (d), p. 628. Where the buyer elects to rescind, he shall cease to be liable for the price upon returning or offering to return the goods. Uniform Sales Act § 69 (4), Acts 1929, ch. 192, § 69 (4), p. 628.

In this case, the harassment caused Paddock by Arena was grounds for rescission under the Uniform Sales Act.

Associates, in its complaint, chose to treat the cashier's check as a promissory note. Negotiable Instruments Law § 130. Acts 1913, ch. 63, § 130, p. 120. *Brady on Bank Checks,* 3rd ed., § 13.7, p. 426, sets out the following general rules on cashier's checks:

> "A cashier's check is a draft or bill of exchange drawn by a bank on itself and is accepted by the act of issuance. In general, a cashier's check is not subject to countermand at the instance of the payee or the person who procures the issuance thereof.
>
> * * *
>
> "In some instances courts have permitted the issuing bank to resist payment at the request of the payee or purchaser. Thus several courts have permitted the payee to stop payment after he had indorsed a cashier's check in payment of gambling losses. It has also been indicated that a bank may refuse to pay a cashier's check, at the request of the purchaser, where the instrument is in

the hands of one who is not a holder in due course. Moreover it has been indicated that the payee may have payment stopped if the cashier's check is deposited for collection and the depositary bank (which has become insolvent in the meantime) is not a holder in due course. And it has been held that a bank issuing a cashier's check in exchange for a worthless check might properly refuse payment because of failure of consideration, where the cashier's check was still in the hands of the original payee who was not a holder in due course."

The case, *Kinder* v. *Fischers National Bank* (1931), 93 Ind. App. 213, 177 N. E. 904, is in agreement with the last sentence of the quoted material.

We agree with the reasoning of a recent Ohio case, *Leo Syntax Auto Sales, Inc.* v. *People Bank and Sav. Co.* (1965), 6 Ohio Misc. 226, 215 N. E. 2d 68, where the court said:

"But where the purchaser of a cashier's check is also the payee, while the right of countermand does not exist, the court is of the opinion that a different rule should be applied where the bank declines payment thereon voluntarily on the ground the purchaser's and payee's endorsement was secured by fraud or for failure of consideration.

\* \* \*

"We are therefore of the opinion that [in the case of] the purchaser of a cashier's check made payable to himself or order, the issuing bank may, but is not compelled to do so, refuse payment thereon to an endorsee, at the request of the purchaser, if such endorsee is not a bona fide holder for value direct from the purchaser or has obtained such endorsement from the purchaser by fraud perpetrated upon him by the endorsee.

"We are also of the opinion that upon suit by an endorsee who obtains the endorsement of the purchaser of a cashier's check against the issuing bank to recover the face amount of such check payable to the purchaser thereof or his order, for the bank's dishonor of such a check, the bank is entitled to have the benefit of any defense that the purchaser could have against the endorsee."

In the case at bar, there was a failure of consideration between Paddock and Sheline. This failure of consideration

would be a valid defense against a person who is not a holder in due course. The payee of a cashier's check is not a holder in due course. *Kinder* v. *Fischers National Bank, supra.*

From the above reasoning, we are of the opinion that Associates is not a holder in due course and that appellant, when sued by Associates, was able to assert the defense available to Paddock. Therefore, the decision of the court below is contrary to law. The trial court is instructed to enter judgment for the appellant consistent with this opinion.

Judgment reversed.

Wickens, C. J., Faulconer, J., Prime, J., concur.

NOTE.—Reported in 221 N. E. 2d 684.